IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHARON KAY SEDANO,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | CASE NO. 4:13CV3091<br><br>MEMORANDUM AND ORDER ON REVIEW OF THE FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY |

Sharon Kay Sedano filed a complaint on May 2, 2013, against the Commissioner of the Social Security Administration. (ECF No. 1.) Sedano seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., 1381 et seq. The defendant has responded to the plaintiff's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 10, 11). In addition, pursuant to the order of Judge Joseph F. Bataillon, dated July 9, 2013, (ECF No. 13), each of the parties has submitted briefs in support of her position. (See generally Pl.'s Br., ECF No. 14; Def.'s Br., ECF No. 24, Pl.'s Reply Br., ECF No. 25). After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

Sedano applied for supplemental security income on April 7, 2010, and for disability insurance benefits on August 11, 2011. (See ECF No. 11, Transcript of Social Security Proceedings (hereinafter "Tr.") at 13). Sedano alleged an onset date of January 1, 2010. (Id. at 138). After her application was denied initially and on

1

reconsideration, (id. at 84-87, 88-94) Sedano requested a hearing before an administrative law judge (hereinafter "ALJ").   (Id. at 79). This hearing was conducted on February 14, 2012. (Id. at 29-78). In a decision dated April 30, 2012, the ALJ concluded that Sedano was not entitled to disability insurance benefits. (Id. at 10-28). The Appeals Council of the Social Security Administration denied Sedano's request for review. (Id. at 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Sedano seeks judicial review.

## II.   SUMMARY OF THE RECORD

Sedano, who was born March 21, 1970, (id. at 142) has an associate's degree in medical assisting. (Id. at 38). She lived with her boyfriend and her two children, ages 16 and 17. (Id. at 36). Sedano had previous work experience as a cleaner in a food processing plant, kitchen aide, personal care technician, and nutrition manager. (Id. at 177). She last worked in October 2011. (Id. at 38).

### A. Medical Evidence

Sedano reported that she sustained injuries to her lumbar spine in 2000 and had a discectomy at L4 in 2001. (Id. at 18). Sedano had been diagnosed with degenerative disc disease of the lumbar spine with herniations, status post discectomy, failed back syndrome, and degenerative joint disease of the cervical spine. (Id. at 18-19). She complained of leg pain, stiffness, and numbness, which she said caused her to fall. She also said she experienced periodic paralysis about once a week. (Id. at 46-50, 138).

The records show that Sedano received treatment at a clinic associated with the Webster County Community Hospital. On July 21, 2009, Sedano complained of nerve pain in her arms, chest, and legs. (Id. at 282). She was given a prescription of Neurontin and told to use a warm bath for pain. Kelly Oberlechner, APRN,

wrote in Sedano's records, "I think she's just kind of lingering here with symptoms." (Id.).

Sedano also complained at several times of chest pain. On August 25, 2009, she was admitted to the hospital for observation and a cardiac workup. (Id. at 281). The cardiac workup was negative and it was determined she likely had bronchitis. (Id. at 301). She was discharged with medications. (Id. at 302). Sedano again complained of chest pain in January 2010 and was admitted to the hospital with musculoskeletal chest pain, musculoskeletal cervical spine and shoulder pain, and a history of degenerative joint disease. (Id. at 330). It was determined that she had no acute myocardial infarction. Because most of her pain seemed to emanate from the lower posterior cervical spine, an x-ray was taken, but it showed no irregularities. Sedano was seen by a physical therapist and given an exercise program. (Id.). She also received treatment at the Nebraska Heart Institute between 2004 and 2012. (Id. at 611-648).

In February 2010, an examination of Sedano's back indicated it was normal. (Id. at 382). She seemed to have minimal pain with palpation of the back, decreased range of motion, and decreased straight leg raising. She was given medication and referred to a pain clinic. (Id. at 383). On March 4, 2010, Sedano went to the emergency room for sharp pain in the middle of her back, and it was determined that she had pneumonia. (Id. at 352). X-rays on March 22, 2010, showed that Sedano had multilevel disc disease. (Id. at 397). An x-ray of the thoracic spine on April 16, 2010, showed hypertrophic degenerative change. (Id. at 411). An EEG to check for possible seizure activity was normal. (Id. at 412). In July 2010, imaging of the lower back showed "degenerative disease throughout without any focal spot to cause stenosis or sciatica-like pain." (Id. at 441). Sedano received several cervical and lumbar epidural steroid injections for back pain

throughout the summer of 2010. (Id. at 404, 437-43).

In November 2010, Sedano was examined by Christopher S. Kent, M.D., a neurosurgeon (Id. at 519). Her chief complaint was low back pain, groin pain, leg pain bilaterally, leg numbness, right thigh numbness, and incontinence. Sedano explained that she had not lost control of her bowel and bladder, but she had no feeling when she urinated. She reported that she had not undergone any physical therapy and had no chiropractic manipulation. She walked with a slow gait but was able to raise herself up out of the chair without using her hands. She was able to walk on her toes and heels, but was unable to do repetitive step ups on the right. (Id.). She had no abnormal reflexes and was negative on straight leg raising. (Id. at 520). She had pain with internal rotation of her hips bilaterally. Kent stated that there were no findings based on an MRI that could explain all of Sedano's complaints and there were no findings on x-ray that would explain the urinary changes. He did not believe any surgical intervention would benefit her. Kent ordered a T-spine MRI to ensure there was no abnormality, EMGs of her lower extremities, and facet injections to help with lower back pain. (Id. at 520).

Sedano was treated for neck and low back pain at a pain management clinic beginning in February 2011. (Id. at 571). She was prescribed medications and a TENS unit. (Id. at 573). In May 2011, her medication regimen was continued because it was successful in controlling her pain. (Id. at 567). In July 2011, Sedano stated that she was doing well on her current medical regimen. (Id. at 562). She rated her pain a 2-3 on a scale of 1-10. (Id.).

In April 2011, Sedano went to the hospital complaining of episodic quadriparesis. (Id. at 555). No objective organic basis was found for her symptoms. Douglas T. Brown, M.D., stated that he did not have anything more to offer diagnostically or therapeutically. He referred Sedano to neuromuscular specialists

at the University of Nebraska Medical Center (UNMC) for any possible ideas as to the cause of her very unusual symptoms. (Id. at 555-56).

J. Americo Fernandes, M.D., UNMC, examined Sedano on October 19, 2011. (Id. at 707). He reported that the etiology of her pain was unclear. (Id. at 709). Fernandes examined her again on February 15, 2012, (Id. at 716) and blood tests were unrevealing. (Id. at 718). Sedano had started taking Lyrica and received mild benefit, so Fernandes increased the dosage. He stated that Sedano's history was not typical for periodic paralysis. (Id.).

## B. Medical Opinion Evidence

In August 2010, Sedano was examined by Daniel E. Mazour, M.D., for her disability benefits application. (Id. at 450-53). He determined that she had crepitus in both knees and marked spasm and pain along the paravertebral muscles of the low back, upper thoracic, and cervical regions. (Id. at 452). Sedano reported numbness in her right thigh, but she had full range of motion. Mazour's impression was spinal stenosis/degenerative disc disease both in the lumbar and cervical spine, COPD, positive smoker, borderline hypertension, dysthymia, and obesity. (Id.). He stated that some of her problems could be worked with and that she would eventually be a candidate for vocational rehabilitation. Sedano was able to walk, but could not sit for long periods of time. Mazour said Sedano had intermittent neuropathy, primarily on the right side. (Id. at 453).

Arthur Weaver, D.O., a state agency medical consultant, completed a physical residual functional capacity (RFC) assessment in September 2010. (Id. at 458-65). Weaver noted that no particular injury or symptom appeared to be consistent with Sedano's alleged onset date. (Id. at 466). In August 2010, she had reported having back pain for a number of years and there was a remote history of an L4-5 discectomy. Sedano's claim that her legs gave out a couple of times a day

5

at work apparently did not preclude employment as a commercial kitchen aide, and there was no independent confirmation of her claim. (Id.). The records showed that Sedano had been noncompliant with medication. A neurology referral had been made, but there was no indication Sedano followed through with it. She also reported inconsistent information about disabling headaches, at one time denying chronic headaches but also reporting that she had incapacitating headaches. And she reported that, after receiving an injection to her neck, for the first time in three years she did not wake up with a headache. (Id.).

Weaver noted that Sedano said her noncompliance with medication was related to financial limitations, but she had been able to regularly use tobacco. (Id. at 467). Weaver stated that available objective information did not support severe neurological dysfunction. Records indicated that Sedano cared for pets and teenagers. She continued to work regularly, prepared full balanced meals, did dishes and vacuumed. She visited relatives, did laundry, and gardened with assistance. (Id.).

Weaver determined that Sedano could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Id. at 459). Sedano could stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. She had to periodically alternate sitting and standing to relieve pain or discomfort. Weaver stated that Sedano's need for positional change could likely be accommodated by normal work breaks. She was unlimited in her ability to push and/or pull. (Id.). Weaver stated that Sedano had occasional limitations in climbing a ramp or stairs, balancing, stooping, kneeling, crouching, and crawling. (Id. at 460). Sedano had no manipulative, visual, or communicative limitations. (Id. at 461-62). Weaver stated that Sedano should avoid concentrated exposure to vibration and hazards such as machinery and heights. (Id. at 462).

6

Weaver stated that with regular care and when compliant with medication, Sedano was capable of activity listed on the RFC. (Id. at 467).

David Duke, Ph.D., completed a psychological interview of Sedano at the request of Disability Determination Services on September 9, 2010. (Id. at 468-476). At that time, Sedano reported that she was working for the Midlands Area Agency on Aging for four hours a day as the nutrition manager, which involved filling sacks and coolers with food to serve meals to the elderly. (Id. at 472). She reported that since her back injury in 2000, she had constant headaches, backaches, and pain with limited mobility. (Id.). Sedano reported that she was not currently taking antidepressants because she could not afford them. (Id. at 473). She had no history of outpatient counseling or inpatient psychiatric treatment. She described her mood as mostly melancholy with periodic sadness but no episodes of major depression. If she started to get depressed, Sedano said she talked with her fiancé and her family and they cheered her up. She denied symptoms of panic disorder or obsessions and compulsions. (Id.). She reported mild worry and anxiety and low levels of energy. (Id. at 474).

Duke stated that Sedano's affect was within normal range and congruent with content. (Id.). He found no restriction of activities of daily living due to mental health. (Id. at 470). There were no difficulties in maintaining social functioning and no recurrent episodes of deterioration when stressed. Duke said Sedano had the ability to sustain concentration and attention needed for task completion, the ability to understand and remember short and simple instructions, the ability to carry out short and simple instructions under ordinary supervision, the ability to relate appropriately to coworkers and supervisors, the ability to adapt to changes in the environment, and the ability to handle her own funds. (Id.). Duke's diagnostic impressions were that Sedano had depressive disorder and anxiety

7

disorder, and her GAF was 53.[1] (Id. at 475). He said her mental health prognosis was fair. She was able to use some coping skill for managing symptoms of depression and was open to counseling if needed. Duke stated that it was very likely that counseling and medication management would be effective in continued management of Sedano's depression and anxiety. (Id.).

Linda Schmechel, Ph.D., a state agency psychological consultant, completed a psychiatric review technique on September 27, 2010. (Id. at 476-90). Schmechel noted that Sedano had not alleged any mental impairment. (Id. at 489). Schmechel found that Sedano had a depressive disorder and an anxiety disorder that were not medically determinable impairments. (Id. at 480, 482). Based on Sedano's mental health, Schmechel found that Sedano had no restrictions on activities of daily living, in maintaining social functioning, or in maintaining concentration, persistence, or pace. (Id. at 487). She had one or two repeated episodes of decompensation. (Id.). Although Mazour's August 2010 physical consultative examination resulted in a diagnosis of dysthymic mood disorder, activity forms completed by Sedano and third parties did not allege any mental impairment. (Id. at 489). Schmechel concluded that the overall evidence did not show that Sedano experienced any severe limitation due to a mental impairment. (Id.). Patricia Newman, Ph.D., affirmed the findings of Schmechel's mental RFC in January 2011. (Id. at 551).

Steven G. Higgins, M.D., a state agency medical consultant, affirmed the physical RFC in January 2011. (Id. at 553). Higgins stated that he had reviewed

---

[1] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of

updated records and found no need to change Weaver's prior assessment that Sedano had functional limitations consistent with the retained ability to perform light work. (Id. at 553-54).

### C. Hearing Testimony

At a hearing on February 14, 2012, Sedano testified that she left her job with the Midland Area Agency on Aging on October 30, 2011, after her supervisor asked her to get a form from her physician showing that she was physically fit. (Id. at 38). Her doctor said the form needed to be signed by a physical therapist, but the insurance company would not authorize it because it was not ordered by a doctor, so she was replaced. (Id. at 38-39). Since that job, Sedano had not looked for work or done any volunteer work. (Id. at 39).

Although Sedano had a driver's license, she said she only drove about two blocks at a time to the grocery store because she did not trust her body. (Id. at 36). She had someone else drive her to doctor's appointments. She said she did not want to be behind the wheel when she got electrical impulses in her spinal cord and her body stiffened. (Id.).

Sedano testified that:  She could not sit straight up in bed and needed help getting out of bed. (Id. at 46). Her muscles locked up when she lay flat. Her boyfriend sometimes had to help her get dressed because she could not bend to put on her pants. She could not step in and out of the shower by herself because she could not lift her leg up over the bathtub. She could not go up and down stairs without help because she never knew when her back was going to give out and she would fall. She sometimes had a stabbing pain in her spinal cord, her legs felt like rubber, and she would fall. (Id. at 46). When she had sharp pains at the top of her

---

Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)).

spinal cord, her arms locked up, her hands curled up, and someone had to force her fingers apart to loosen the muscles and help stop the pain. (Id.). Sedano also testified that she had bouts of temporary paralysis that lasted up to 1½ hours once a week. (Id. at 46-48). She had total paralysis on three occasions. (Id. at 47). Sedano said she fell about three times per week. (Id. at 48).

Sedano also said:  She was in constant pain and had migraine headaches. She took morphine three times each day. (Id. at 47). She lost the mobility in her neck and could not turn her head to the left and her legs sometimes felt like they were on fire. Lyrica helped take away the fire sensation, but her legs still hurt. She said she retained fluid and had incontinence. (Id.).

Sedano said she stopped cleaning her house in January 2008. (Id. at 49). When she worked four hours per day at the aging agency, she had to lie down when she got home, and rest before she could cook supper. (Id.). Sedano said her boyfriend removed a wall between the kitchen and dining room to make it bigger because if she was in the kitchen and fell it was hard for her boyfriend and her sons to have room to get on each side of her to pick her up. (Id. at 50).

Sedano said she could not work four hours per day, because she had tinges of pain and had to sit down. (Id. at 51). She lay down twice a day to rest her neck. (Id.). When she lay down, she had severe muscle cramps, causing her to scream in pain. (Id.). She said she got about four hours of sleep per night. (Id. at 52). Sedano said she smoked less than one-half pack of cigarettes each day and she was in the process of quitting. (Id. at 56). She said medications and a TENS unit helped her pain. (Id. at 57-58).

Sedano said she washed dishes when she could stand. She cooked, folded laundry, dusted, and managed bills. (Id. at 60). She used a motorized cart at the store. (Id. at 61). She said she could lift about 10 to 15 pounds, stand for a couple

of hours before she needed to sit down, and sit for an hour before needing to stand or walk. (Id. at 62-63). During the day, Sedano did not use any assistive device, but did use a walker at night. (Id. at 63).

Robin Cook, vocational expert (VE), was asked a hypothetical question about an individual of Sedano's age, education and work experience with the same functional limitations. (Id. at 69). Cook stated that such an individual could perform a significant number of sedentary jobs in the national economy. (Id. at 69-72). If the individual was limited to lifting 10 pounds occasionally and standing and walking for up to two hours and sitting for up to six hours, the individual would be able to find employment as a document preparer, microfilm; final assembler, optical; and charge account clerk. (Id. at 70-71). If the individual was precluded from any repetitive rotation, flexion, or extension of the neck, none of the jobs would need to be changed. (Id. at 71-72).

### E. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be disabled at step three or step five.  See id.  In this case, the ALJ found that Sedano is not disabled.  (See Tr. at 13-23).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See id.  The ALJ found that Sedano had not engaged in substantial gainful activity since January 1, 2010, the alleged onset date. (Tr. at 15).

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Sedano had the following severe physical impairments: degenerative disc disease of the lumbar spine with herniations, status-post discectomy, disc bulge of the cervical spine, and obesity. (Tr. at 15). The ALJ found that Sedano's alleged headaches were nonsevere because they caused her no more than the minimal functional limitation in her ability to perform basic work activities. (Id. at 16). The ALJ also found that Sedano's medically determinable mental impairments of depressive disorder and anxiety disorder, considered singly and in combination, did not cause more than minimal limitation in her ability to perform basic mental work activities and were therefore nonsevere. (Id.).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment

12

"that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  <u>See</u> 20 C.F.R. § 404.1520(a).  The ALJ found that Sedano did not have an impairment or combination of impairments that met or medically equaled the severity of  one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Tr. at 17).

Step four requires the ALJ to consider the claimant's RFC[2] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv), (f). In this case, the ALJ found that Sedano had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) in that she could stand and walk for up to two hours in an eight-hour day, and sit for up to six hours in an eight-hour day. She could lift up to 10 pounds occasionally. She could never climb ramps, stairs, ladders, ropes or scaffolds. She could occasionally balance and stoop, but she could never kneel, crouch or crawl. She needed to avoid all exposure to excessive vibration, operational control of moving machinery, exposure to moving

---

[2]   The assessment of a claimant's residual functional capacity measures the highest level of physical and mental activity the claimant can perform despite his or her limitations. See 20 C.F.R. § 404.1545 and 20 C.F.R. § 416.945. See also <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (residual functional capacity is what the claimant is able to do despite limitations caused by all of the claimant's impairments.).

machinery, and exposure to unprotected heights. She should perform no repetitive rotation, flexion, or extension of the neck. (Id. at 17).

The ALJ found that Sedano's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Id. at 18). However, the ALJ found that Sedano's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC. (Id.). The ALJ also found that Sedano was unable to perform any past relevant work. (Id. at 21).

Step five requires the ALJ to consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(A0(4)(v), (g); id. § 416.920(a)(4)(v), (g). Here, the ALJ determined that, considering Sedano's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Sedano can perform. (Tr. at 21). The ALJ concluded that Sedano had not been under a disability from January 1, 2010, through the date of the decision. (Id. at 22).

### III. STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (internal

citations omitted).   A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).   "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### RFC Finding

Sedano does not contest the ALJ's findings through step four of the sequential evaluation process. (Pl.'s Br. at 5). She first argues that the ALJ's RFC finding was based on unreliable information. (Id.). Sedano claims that the ALJ

should have included restrictions based on Sedano's mental impairments in the hypothetical question presented to the vocational expert. (Pl.'s Br. at 6).

The ALJ noted that Sedano reported no restrictions to her activities of daily living due to mental health issues. (Tr. at 16). The ALJ found no difficulties in Sedano's social functioning, based on Sedano's ability to maintain a relationship with her boyfriend and her two teenage sons, her ability to interact well socially, and to shop and go out in public. (Id.). The ALJ also found that the record showed Sedano had no problem sustaining concentration, that her memory and fund of knowledge were intact, and that she had no problems with attention span. She had no problem handling stressful situations, did not have impulse control issues, and could carry out at least simple instructions. The ALJ noted that Sedano indicated she participated in concentration-oriented activities such as reading, sewing, and using the computer. (Id.). The ALJ also found that Sedano had experienced no episodes of decompensation which had been of extended duration. (Id. at 17).

The ALJ gave significant weight to the opinion of Schmechel that Sedano's mental health impairments were nonsevere. (Id. at 20). Newman affirmed that opinion. (Id. at 21). The ALJ noted that the record showed that Sedano did not require specialized treatment for her alleged psychiatric impairments. (Id.).

The ALJ asked the vocational expert whether jobs exist in the national economy for an individual of Sedano's age, education, work experience, and RFC. (Id. at 22). The VE testified that such an individual would be able to perform the requirements of representative occupations such as document preparer, microfilm, which has 354 jobs in Nebraska and 63,382 in the United States; final assembler, optical, which has 980 jobs in Nebraska and 229,240 in the United States; and charge account clerk, which has 4,390 jobs in Nebraska and 204,730 in the United States. (Id.). The ALJ found that Sedano was capable of making a successful

16

adjustment to other work that exists in significant numbers in the national economy. (Id.). The ALJ determined that Sedano had the RFC to perform sedentary work. (Id. at 17).

Sedano asserts that the DOT (Dictionary of Occupational Titles) requirements for the jobs identified by the vocational expert require mental reasoning ability of a level 2 or 3 and a language ability of 3, which all require more than a high school education. (Pl.'s Br. at 7). Thus, Sedano argues, she "could not adequately perform two of the jobs listed by the VE." (Id.). However, the record shows that Sedano received an associate's degree in medical assisting. (Tr. at 38). Therefore, she has the requisite education to perform the jobs identified by the VE.

Sedano also argues that there are 200 separate unskilled sedentary occupations, and, if she could perform only three of those occupations, it is clear that she is unable to perform a full or wide range of unskilled sedentary work activity. (Pl.'s Br. at 7). She claims that the categories of jobs identified by the vocational expert either conflicted with or were inconsistent with the DOT. (Pl.'s Br. at 8). The vocational expert 's testimony was not inconsistent with the DOT, though it may have addressed issues that are not explicitly mentioned in the DOT. (Tr. at 76). Sedano does not explain in what manner the vocational expert's testimony was inconsistent with the DOT, and I find no merit to this argument.

An ALJ must determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of her limitations. McKinney v. Apfel, 228 F.3d 860 (8th Cir. 2000). It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).

In determining Sedano's RFC, the ALJ noted that Sedano is 5'6" tall and weighed 224 pounds, making her obese, which contributed to the severity of her alleged impairments. (Tr. at 18). The ALJ noted that Sedano had been diagnosed with degenerative joint disease of the cervical spine, although an x-ray of the cervical spine on January 8, 2010, showed no fracture or malalignment. (Id. at 19). An MRI of the cervical spine on July 27, 2010, showed no evidence of herniation, but an MRI of the cervical spine on April 6, 2011, showed minimal posterior midline bulging of the discs at C5-6 and C6-7. (Id.).

Sedano reported that she had attempted injection therapy, a TENS unit, muscle relaxers, joint medications, and topical pain treatments. (Id.). The ALJ adjusted the RFC assessment in the areas of exertional level, postural positions, and environmental factors based on Sedano's allegations and the medical evidence in the record. (Id.).

The ALJ noted that the medical record showed that despite Sedano's allegations of disability, her treatment and medications had been effective in controlling her symptoms. After she received injection therapy treatment, Sedano reported that she woke up without a headache for the first time in three years. She later reported that she received four months of pain relief from her injections. She also reported a decrease in pain when she used prescription Toradol. She reported to her doctor that her current medication regimen had been successful in controlling her pain. She reported that she was able to sleep through the night despite her symptoms. (Id. at 19). Sedano testified that she had bowel and bladder incontinence, but the medical record indicated that Sedano had not lost bowel or bladder control and she denied incontinence at her appointment on May 13, 2011. She also had recently indicated that she experienced feelings of urinary urgency

and constipation, which the ALJ found suggested that she did not currently experience loss of feeling in the bowel and bladder areas. (Id.).

I find no error in the ALJ's determination of Sedano's RFC, which reflects the highest level of physical and mental activity the claimant can perform despite her limitations. The record supports a finding that Sedano can do sedentary, unskilled work and that there are a number of jobs in those categories in the state and national economy.

*Evaluation of Pain*

Sedano also argues that the ALJ erred in failing to properly evaluate her pain when making an assessment of her RFC. (Pl.'s Br. at 9). Federal regulations provide that statements about a claimant's pain do not alone establish a disability. 20 C.F.R. § 404.1529. There must be medical signs and laboratory findings which show that the claimant has medical impairments which could reasonably be expected to produce the pain or other symptoms alleged. Id. In evaluating the intensity and persistence of symptoms, including pain, the ALJ takes into consideration all available evidence, including medical history, medical signs and laboratory findings, and statements about how the symptoms affect the claimant. Id.

In evaluating Sedano's allegations of pain, the ALJ noted some inconsistencies. For example, Sedano testified that she experienced total body paralysis once per week, (Tr. at 20) but during treatment with a neurologist, she reported that the paralysis had only occurred a total of three times. Brown could find no objective organic basis for Sedano's symptoms of weakness, and the results of MRIs did not explain Sedano's widespread complaints. Fernandes opined that Sedano's history was not typical for periodic paralysis. In addition, the ALJ noted that throughout all of Sedano's treatment, there was no record that she had been

19

given restrictions on activity. In fact, she had been advised to participate in physical therapy and exercise to reduce her symptoms. The ALJ noted that Sedano maintained an essentially normal, stable gait, with a normal pace. She had no problems rising from a seated position and had full motor strength in her lower and upper extremities, and full range of motion in her lower extremities. Based on the medical records, the ALJ found that Sedano's back impairments were not as severe as alleged. (Id. at 20).

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the court noted that "[t]he adjudicator may not disregard a plaintiff's subjective complaints solely because the objective medical evidence does not fully support them." The court stated that the adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Id.

The ALJ found that Sedano's physical impairments caused more than minimal functional limitations on her ability to perform basic work activities. (Tr. at 15). In determining that her mental impairments of depressive disorder and anxiety disorder do not cause more than minimal limitations and were nonsevere, the ALJ considered Sedano's ability to take part in activities of daily living, her ability to function socially, her concentration, persistence, or pace, and decompensation. (Id. at 16). The ALJ thoroughly explained her reasoning for the findings and for the RFC. Although Sedano argues that her level of pain should have been taken into consideration when determining her RFC (Pl.'s Br. at 10),

20

there is no support for a finding that the ALJ did *not* take Sedano's allegations of pain into consideration.

*Weight to Mazour's Opinion*

Sedano next argues that the ALJ abused her discretion and erred in failing to give sufficient weight to the opinion of Sedano's treating physician. (Pl.'s Br. at 10). The ALJ stated that she gave some weight to the opinion of Mazour, who examined Sedano as an independent consultative examiner. (Tr. at 20). Mazour opined that Sedano had marked limitation of work ability due to her prior limitations. However, he stated that some of her problems could be addressed and perhaps Sedano would eventually be a candidate for vocational rehabilitation. He noted that she was able to walk, could not sit for long periods of time, and intermittently had some neuropathy, primarily right sided. The ALJ accorded some weight to Mazour's opinion because it was consistent with the medical record, which showed that Sedano had been advised to exercise and attend physical therapy to rehabilitate herself. (Id.).

The weight given to medical opinions is governed by 20 C.F.R. § 404.1527(c), which provides that factors, such as the examining relationship and the treatment relationship, including its length, nature, and extent, will be taken into consideration. In addition, "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight" will be given to the opinion. 20 C.F.R. § 404.1527(c)(4). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Travis v. Astrue, 477 F.3d 1037 (8th Cir. 2007).

Sedano also suggests that Mazour's opinion should have been given greater weight because he was a treating physician. (Pl.'s Br. at 10-11). Based on the record before me, I do not find that Mazour was a treating physician. He examined

Sedano on one occasion as part of a consultative examination for her disability application. There is no evidence that she saw him on a regular basis for treatment. Pursuant to 20 C.F.R. § 404.1502, a treating source is the claimant's own physician who provides the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. In fact, a medical source that is seen solely for the claimant's need to obtain a report in support of a disability claim is considered a "nontreating source." Id. Because Mazour was not a treating physician, I find no error in the weight given his opinion by the ALJ.

*Sedano's Credibility*

Sedano also argues that the ALJ abused her discretion and erred in finding that Sedano's testimony was not credible. (Pl.'s Br. at 11). The ALJ found that Sedano's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. at 18).

The ALJ explained her reasons for finding Sedano's statements to be less than credible. The records showed no fracture or malalignment of Sedano's cervical spine, although there was evidence of early, mild multilevel disc disease. (Id. at 19). Sedano had undergone treatment and taken medications that she said had been effective in controlling her symptoms, yet she continued to report disabling pain. She reported incontinence at one time, but later denied having any bladder issues. Although Sedano reported total body paralysis once a week, she also stated that it had occurred only three times. Two neurosurgeons reported that they could  find no basis for Sedano's complaints related to paralysis. There was no record that Sedano had ever been given restrictions on activity, and in fact, she had been advised to take part in physical therapy. Sedano had a normal, stable gait, had full motor strength and full range of motion in her lower extremities, and full

strength in her upper extremities. Based on the totality of the information, the ALJ found that Sedano's back impairments were not as severe as she alleged.

The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. Johnson v. Apfel, 240 F.3d 1145 (8th Cir. 2001). An ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002). I cannot substitute my opinion for that of the ALJ, and I find no error in the ALJ's determination of the credibility of Sedano's testimony when taken into consideration with the medical evidence in the record.

*Letter from Employer*

Sedano also complains that the ALJ did not mention a letter from Sedano's last employer,  and she claims this is reversible error. The record includes a letter from Mary Delka, director of Webster County Senior Services, dated December 7, 2011, in which she stated that she requested Sedano get a fitness-for-duty certification form signed by a physician after Sedano reported that she had fallen in her home. (Tr. at 258). The fitness-for-duty certification form is included in the record, but it is not completed or signed. (Id. at 262-63).

Sedano argues that lay testimony regarding a claimant's symptoms or how an impairment affects the ability to work is competent evidence that the ALJ must take into account unless the ALJ expressly disregards such testimony and gives reasons for doing so, citing Lewis v. Apfel, 236 F.3d 503 (9th Cir. 2011).

The U.S. Court of Appeals for the Eighth Circuit has held that, although the ALJ is required to develop the record fully and fairly, the ALJ is not required to discuss every piece of evidence submitted. Black v. Apfel, 143 F.3d 383 (8th Cir. 1998). In addition, an ALJ's failure to cite specific evidence does not indicate that

such evidence was not considered. Id. Sedano testified that her employer asked Sedano to get a form signed after she reported falling at home, but Sedano did not get the form signed. I do not find that the ALJ's failure to mention the letter shows that the ALJ did not consider the letter; and I do not find that any failure to mention the letter requires remand.

## V.   CONCLUSION

The ALJ considered Sedano's age, education, work experience, and RFC, and determined there are jobs that exist in significant numbers in the national economy that Sedano could perform. (Id. at 24). The ALJ based her decision on the entire medical record, testimony at the hearing, and opinions of experts, and found that Sedano is not disabled. I find that there is substantial evidence based on the entire record to support the ALJ's factual findings. Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). The ALJ's decision, therefore, will be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

Dated this 23rd day of April, 2014.

BY THE COURT

s/Laurie Smith Camp
Chief United States District Judge